JUDGE GREEN,
delivered the following opinion, in which the other Judges concurred.*
John McRae, sen. made his will in February, 1804, and died in the same month. By this will, after directing, “In the first place, I devise all my just debts to be paid, as soon as it can be conveniently done by my executors,” (and making sundry specific devises and bequests of real and personal property, and sundry pecuniary legacies to a large amount, and, amongst the rest, an annuity of £50 per annum, to Mrs. V. Claiborne during her life,) he gave as follows: “In the sixth place, I give all the rest and residue of my estate to my brothers and sisters residing in the Kingdom of Great Britain, and my sister residing in Virginia, equally to be divided amongst them, share and share alike, to hold to them and their lawful representatives, respectively, forever; and, in order to effectuate *my intentions, and to secure the payment of the foregoing legacies, I will and require, that all the rest of my lands and slaves, not herein-before mentioned, shall be sold by my executors herein-after mentioned, or such of them as may undertake the execution of this my will, on twelve months credit, at public sale, and the purchasers to give bond and security satisfactory to my executors, whom I do, in like manner, desire to sell all the rest and residue of my personal estate, on the same credit and terms, and whom I desire to collect the debts due to me as speedily as they can;” and he appointed John McRae, jr. and Joseph Harding, executors thereof. Harding refused in Court to undertake the execution of the will; and on the 30th of February, 1804, John McRae, jr. qualified, and executed the usual bond, with Hector McNeale, .John Wilder, Joseph Jones, and James Durell, as his sureties.
In April, 1805, John McRae, jr., the executor, purchased from the residuary legatees of John McRae, the elder, their interests in the estate, and gave bonds for the purchase money, with Joseph Jones, Robert Birchett, George Pegram, Paul Nash, and David Robertson, his sureties; and, to indemnify them, executed a deed of trust, which was duly recorded, dated on the 37th of April, 1805, to Thomas B. Robertson and B. W. Leigh, by which he conveyed to those trustees a tract of land called the Globe Tavern; 300 acres, a part of Archer’s Hill tract, being the same conveyed by Watkins to John McRae, sen.; also two lots on the upper end of High street, purchased by John McRae, sen. of Pride; 30 shares in the Manchester Turnpike Company; and 66 shares of Virginia Bank stock; to all of which, he states in the deed, he had a legal right, title, and claim. John McRae, jr., afterwards sold the Bank stock, and paid the larger part of the debt.
On the 16th of September, 1807, John McRae, jr. conveyed in trust to B. W. Leigh, J. G. Wilder, Daniel Eppes, and Thomas Jones, the property embraced in the *deed of the 37th of April, 1805, except the Bank stock, and also the following property: two additional shares in the Manchester Turnpike Company; an estate called New Market, as described in a bond from Bate to John McRae, jr.; a lot on High street, on which a tobacco ware-house was to be built, and 37 slaves; in all of which, the deed states, he had a legal and equitable estate. This conveyance was for the indemnity of the *401 sureties in his executor’s bond. In May, 1809, John McRae, jr. made his will, which was proved on the 3d of July, 1809. The will appointed Richard McRae and Daniel Eppes his executors, and directed that they should qualify without giving security; which they did. But, on the same day, they executed a deed of trust for the further indemnity of the sureties of John McRae, jr., for his administration of the estate of John McRae, sen.; especially as to the two largest legacies of $30,000 each, given by the will of John McRae, sen. to two in fants, payable when they should attain their respective ages of 31 years, and which were not then due. This deed was made in trust to B. W. Leigh, J. G. Wilder, Joel Hammon, and Thomas Jones; and conveyed the property contained in the deed of September, 1807, and also' the following: 15,393 acres of Kentucky land, conveyed by Green-how to J. McRae, jr.; a moiety of a lot in Petersburg, on which the Bank was built, purchased by J. McRae, jr.; and a lot on High street, belonging to J. McRae, jr.
Various suits were prosecuted mutually by the parties, whose interests were affected by, or arose out of, the facts above stated; in all of which, the sureties for the administration of the estate of John McRae, sen. by John McRae, jr. were parties; in the course of which, the greater part of the trust fund, embraced in the last deed of trust, being disposed of, such as had been sold was ascertained to amount to $49,554 09^2, of principal, besides interest to a large amount. No part of the trust fund was sold in the life-time of John McRae, the younger.
*From the proceedings in these causes, it appears, that out of the trust fund, payments had been made by the order of the Court, for the support of the two infant legatees, who were entitled under the will to such support, until they attained the age of 31; and, in full payment of one of the legacies of $30,000; and, for the charges arising out of the execution of the trust, to the amount of $34,337 17; leaving a balance of 31,4391. 0s. 7j4d., besides interest to the amount of $5,503 33, up to January 4th, 1819, belonging to the trust fund; out of which, was paid by the decree of the Court of the 31st of January, 1819, (in satisfaction of the balance due from John McRae, jr. to the residuary legatees, for his purchase from them,) $8,554 33; leaving a balance of the trust fund (besides the property unsold to a considerable amount, probably upwards of $5,000,) of $38,377 96.
Hobson and wife, and Brooks and wife, (the females being two of the legatees of John McRae, sen., entitled to l,000l. each, on account of which, some payments had been made,) severally prosecuted their suits against the executors of John McRae, jr., the sureties for the administration of John McRae, jr. and the trustees; and, upon the confession in Court, of the executors, 'that John McRae, jr., had received assets of the estate of John McRae, sen., which had afterwards come to their hands more than sufficient to pay the debts and legacies, a decree was pronounced in both causes, which came on to be heard together, against the executors of John McRae, jr., for the balance due upon the legacies; and, liberty was reserved to the plaintiffs, to apply to the Court for further relief against the other defendants, if it should become necessary.
Upon appeal, this decree was reversed, because it did not require, bond and security from the plaintiffs to refund, if necessary, for the payment of debts. The decree was thereupon corrected in this particular; and, the bonds being given, execution issued against the executors, which *was returned nulla bona. Thereupon, the plaintiffs gave notice to the sureties, that they would, under the reservation in the decree, apply to the Court to decree the legacies against them. This application was resisted by the sureties on various grounds. They filed a joint affidavit, stating, that they verily ‘ believed that the personal estate of John McRae, sen., which came to the hands of John McRae, jr. to be administered, did not exceed $83,800 89; and, that the real estate sold by him, amounted only to $13,000 36; and, that, he paid debts and legacies to the amount of $68,836 03, and left estate of John McRae, sen. to the amount of $101,989 65, including the trust fund, (which had not been sold,) and exclusive of real estate unsold, and uncollected debts; as appeared by the statement annexed to the affidavit; and, they insisted, 1. That they were not responsible dor the proceeds of the real estate; 3. That as John McRae, jr. left assets of his testator, which came to the hands of his executors, sufficient to pay the debts and legacies of John McRae, sen., they were thereby absolved from responsibility; 3. That they were not liable for the acts of the executors of John McRae, jr.; 4. That they could not be liable upon motion, but only by bill; 5. That the commissioner’s reports in the other causes, were not evidence against them; and, if they were, that they were too imperfect to justify a decree against them. And, it is here objected also, that the balances due upon the legacies claimed by these plaintiffs, are not sufficiently ascertained as to the sureties.
The 4th objection above-stated, would, if well founded, put an end to this cause, and make any enquiry upon the other points at present, unnecessary. This question seems to have been settled in the case of Sheppard’s executor v. Starke and wife, 3 Muni. 39, in which it was said by the Court, that under such a reservation in a decree, a party may resort to the Court for its further interposition, either in a summary way or by bill. It was not necessary, in this case, to put any new fact in issue, *lo enable the Court to do complete justice between the parties. Upon the application of the plaintiffs, upon motion, the Court could do that, which they might, and probably would have done, when fhe decree against the executors was pronounced, but for their confessing assets; that is, to decree against the sureties, if there was already enough in the record to justify a decree; or, if not, to *402 order the necessary accounts, to ascertain the extent of their liability. When the executors confessed assets, it was beneficial to the sureties, that the decree should be immediately pronounced against them, instead of proceeding in the cause, so as to subject the sureties jointly with the executors; since there was a better chance of indemnifying them, by compelling payment from the executors, than if the decree had been delayed. The course taken, was obviously beneficial to the sureties, and they can suffer no possible injury from the subsequent proceeding against them upon motion.
The parties were rightly in Court, and the decree was right or- wrong, as it shall appear that there was or was not in the record, sufficient evidence to shew, that the sureties were responsible to an amount sufficient to justify the decree against them. And this depends upon the various questions discussed at the bar, affecting the extent of their liability.
The first of these is, whether the sureties of an executor are responsible for the proceeds of land, devised to be sold by him.
The Ecclesiastical Court in England, to whom the jurisdiction as to the probat of wills and granting administrations, belonged, never had authority to' require of an executor, a bond for the due administration of the assets; 4 Burns’ Ecclesiastical Law, 176; but, had power at the common law, to demand a bond from administrators, as well in the case of administrations with the will annexed, as in cases of pure intestacy. This appears from the case of Folkes v. Dominique, 2 Stra. 1137, in which it was adjudged, *that a bond given by an .administrator durante minoritate, with the will annexed, with a condition to exhibit an inventory, and to administer duly by paying debts and legacies, though not coming within the statute of the 21st Henry 8th, was good at the common law, as to the payment of legacies; that being a subject of ecclesiastical jurisdiction. The statute of Henry 8th, referred to in this case, provided, that in cage of intestacy, or the executor’s .refusing to prove the testament, the Ordinary should take from him to whom the administration was committed, surety for the true administration of the goods, chattels and debts. 4 Burns’ Eccl. Law, 204. This statute did not extend to any administration with the will annexed, except in the case of the executor’s refusing to prove the will; and it was determined, that the non-payment of a debt could not be as-' signed as a breach of the condition of the bond to administer truly. Under this statute, as well as under the statute of 22 and 23 of Car. 2, the expression, “administer truly according to law,” meaning only, as it was said, to bring in his account. 1 Salk. 316; Lutw. 882. It is of some importance to the just solution of the question under consideration, to ascertain the precise form and substance of the bond given by an administrator with the will annexed, in England, at and before the time when the Legislature of Virginia directed bonds to be taken from all executors and administrators. The form of this bond is not to be found in any book, to which we have access. Yet, it may be ascertained with a sufficient degree of certainty, from circumstances which are accessible. The duties of an executor, and of an administrator with the will annexed, were identically the same, in respect to rendering an inventory and account to the Ordinary; (See, as to the duty of an executor to account to the Ordinary, Toller’s Law of Executors, 490, and stat. 21 Ed. 3, ch. 11,) and as to the payment of debts and legacies. The engagements of the one and the other were probably exactly the same; the executor being bound by *his oath, and the duty of his office; and the administrator with the will annexed, in addition to these obligations, by his bond. The oath of both was probably the same, and indicated the extent of their obligations. The oath of an executor was: “That he will truly perform the will, by paying, first his testator’s debts, and then the legacies therein contained, as far as the goods, chattels, and credits will thereto extend, and the law charge him; and that he will make a true and perfect inventory of all the goods, chattels, and credits, and exhibit the same into the Registry of the Spiritual Court, at the time assigned by the Court,' and render a just account thereof, when lawfully required.” Toller’s Law of Exec. 58. As this oath was intended to extend to all the obligations of the executor, as such, it may be confidently supposed, that the bond taken of an administrator with the will annexed, was in the form of this oath; and this is indicated by the case in Strange. This oath and bond were intended to insure the performance of those duties which devolved on the executor or administrator with the will annexed, purely in the character of executor or administrator, and which the Ordinary had a right to exact the performance of. The goods, chattels, and credits were the subject to be inventoried and accounted for; and out of which, the debts and legacies were to be paid; and the engagements made by the executor could not be considered as extending to any subject, over which the Ordinary had no sort of jurisdiction. The Ordinary could not lawfully exact an engagement upon a subject, not confided to his jurisdiction; and if he did, a prohibition might be had. Thus, if he attempted to exact a bond (before the statute of 22 and 23 of Charles 2, which authorised such a bond,) from an administrator to distribute the surplus, a prohibition lay; and, if such a bond was taken, it was void. Lev. 233. The bonds taken from an administrator, or administrator with the will annexed, were originally considered as a security to the Ordinary alone, for the performance of the duties of *the administrator, and that creditors could not avail themselves of it, although legatees' could; because, legatees had a remedy in the Ecclesiastical Court, and no where else; whilst creditors had a remedy only in a Court of Law, and not in the Ecclesiastical Court. It is only in corn- *403 paratively modern times, and since the statute of Charles 3, that creditors have been permitted to avail themselves of the bond. Archbishop of Canterbury v. House, Cowp. 140; Greensides v. Benson, 3 Atk. 218. The bond being taken originally, for the purpose of enabling the Ordinary to enforce the performance of the duties •which he had a jurisdiction to enforce, could not extend to subjects as to which he had no jurisdiction. It was taken, because the Ecclesiastical Courts could only enforce their decrees by ecclesiastical censures, which might sometimes be inefficient, and the bond, in that case, was necessary to give a more effectual remedje It might be taken from administrators, because they claimed under the Ordinary, and not as a matter of right; whilst it could not be taken of executors, because they claimed under the testator, and as a matter of legal right. 11 Viu. 359, pi. 12. The Ordinary had jurisdiction of matters testamentary only. But the proceeds of laud, given by the testator for the payment of debts and legacies, were not testamentary, and the executor was not bound to put such proceeds into the inventory. 14 Yin. 468, pi. 14. The Ordinary had, originally, the exclusive jurisdiction of enforcing the payment of legacies, payable out of personal assets, until the time of Lord Nottingham, when the Chancery, for the first time, assumed a jurisdiction over that subject, upon the grounds that the executor was a trustee, and that the remedy in the Ecclesiastical Courts was defective. Toller’s Law of Exec. 483. But, the Ecclesiastical Courts never had a jurisdiction to enforce the payment of legacies out of the proceeds of land devised to be sold, that not being a testamentary subject. Dyer 151; Palm. 130; 3 Show. 50, pi. 36; Hob. 365. It was a mere trust, which, at all times, could *only be enforced in a Court of Equity. The words, therefore, in the oath of an executor, and in the bond, of an administrator with the will annexed, “and the law shall charge him,” related to the goods, chattels and credits, of which they were bound to return an inventory and account; and not to subjects, of which they were neither bound to render an inventory or account to the Ordinary, and as to which, the Ordinary had no sort of jurisdiction, and meant “and the law shall charge him,” in respect to such goods, chattels and credils. Tf the Ordinary had been permitted to take a bond in the same terms, from an executor, there would have been no possible means of enforcing, by means of the bond, the payment of legacies, payable out of the proceeds of real estate. If there were an express stipulation in the bond, to pay the legacies directed by the will to be paid out of real estate, it would have been void, as relating to a subject not within the jurisdiction of the Court; as bonds taken of administrators for the distribution of the surplus, before the statute of 32 and 33 Charles 3, were void, as not being within the jurisdiction of the Court; a fortiori, then, the general terms “as the law shall charge,” could not be construed as an engagement to pay legacies out of the proceeds of real estate. The judgment was given in the case cited from Strange, because the legacy claimed was payable out of personal assets, and, therefore, within the jurisdiction of the Ecclesiastical Court; and the bond, therefore, good as to the legacy.
Upon the settlement of Virginia, the existing laws of England were our laws. The jurisdictions of the Courts of Common Law and of Equity, and of the Ecclesiastical Courts in England, of necessity devolved upon, and were exercised by, the General Court, consisting of the Governor and Council, the only judicial tribunal in the country. But in the exercise of those jurisdictions, they could not be blended, and could only be properly exercised, according to the existing laws in England, unless modified by statute.
*The first statute passed in Virginia, requiring a bond and security from executors, was enacted in 1711, and related to suspected executors only. This also prescribed the form of the bond to be given by administrators, and the oaths to be taken by executors and administrators. The oath prescribed for executors and administrators, with the will annexed, as well as the form of the bond to be given by them, was the same, and the oath was the same, as the oath of an executor in England, except that the oath prescribed by our statute, omits the stipulation to render an account; which omission was supplied in after statutes. The bond prescribed, contains all the obligations of the oath, and also a stipulation to render an account of his actings and doings therein; that is, in administering the goods, chattels and credits, which shall come to his hands. The form of the administration bond is the same as that prescribed in England by the statute of 33 and 33 of Charles 2. There is the strongest probability that the form of the bond of an executor or administrator with the will annexed, prescribed by our statute, was taken literally from that in use in England, in the case of an administrator with the will annexed. The bond conforms strictly to the form of the oath, as probably did the bond used in England. Our legislation at that time conformed, as to subjects not local, implicitly to English precedents; and, accordingly, this act adopts the form of the administration bond prescribed by the English statute.
The Legislature, in adopting the terms “and' as the law shall charge him,” (which are the only words in the bond, which can give any color to the claim to subject the sureties to a responsibility for the proceeds of land devised to be sold, and which were so familiar in the English law, and there could not in any possible case, be construed to extend to an accountability for the proceeds of land,) must be presumed to have intended to give them the same effect here, which they had there. But independent of this view of the subject, the fair and literal interpretation of the ’-condition of the bond, excludes the proceeds of lands from *404 its operation; they not being goods, chattels or credits, in any case. This condition, after stipulating to return an inventory of the goods, chattels and credits, and to administer the same according to law, and to render an account of ’ his actings and doings therein, proceeds to stipulate to pay and deliver the legacies contained and specified in the testament, as far as the said goods and chattels and credits will thereunto extend, according to the value thereof, “and the law shall charge him.” This expression, “and the law shall charge him,” does not refer to the administration of the goods, chattels and credits, in the payment of debts; for that was already provided for by the previous stipulation to administer them “according to law,” that is, as the law should charge him; and it would have been superfluous to repeat the same stipulation again. It refers only to the delivery and payment of legacies, and has the same meaning as the former expression “according to law,” used in relation to the administration of the goods, chattels and credits. If, indeed, that part of the clause in relation to the payment of legacies “as far as the said goods, chattels and credits will extend, according to the value thereof,” had been omitted, there would have been some color for the construction contended for by the appellees. Then the obligation would be to pay the legacies, to all intents, as the law shall charge him; and if the Legislature had intended that the bond should cover the proceeds of real estate received by the executors, they might possibly have put the bond into that form. But considering the state of the law upon the subject of lands devised to be sold by executors, at the time this act passed, and that such an expression would have' left it doubtful, whether the sureties were bound for any act of the principal, not done in the exercise of his strictly executorial functions; it is probable, that if such had been the intention of the Legislature, they would have expressed it in more explicit terms.
^Whatever might have been the proper construction of a bond, leaving out those words relating to the goods, chattels, and credits, they could have been inserted for no purpose but to shew, that they were the sole subject of stipulation. The words “as the law shall charge him,” were necessarily added, for the purpose of qualifying the 'stipulation in relation to them. Thus, if these words had been omitted, the executor paying a pecuniary legatee, by the disposition of a specific legacy, or paying (when there were not goods, chattels, ’and credits sufficient to pay all the pecuniary legacies,) the whole of the funds to one pecuniary legatee, and none to the others, would not have violated this bond; for, he would have paid the legacies, as far as the goods, chattels, and credits would extend, according to the value thereof, but not as the law charged him. This provision was also necessary, to qualify the preceding stipulation as to goods, chattels, and credits; for, without it, the executor would literally engage to pay the legacies, to the extent of the assets, without regard to the claims of creditors. And, for the same purpose, the words “according to law”' were added 'to the stipulation to administer; for, without them, he might, without violating his bond, have appropriated the assets in the payment of debts, without regard to their dignity. If these consequences are not clear, they are at least such as it is reasonable to presume, the Legislature might wish to provide against. This construction of the bond is fortified by the terms of the oath. In that,. the payment of debts and legacies is not provided for in distinct sentences, as in the bond. But, it engages for the payment of debts and legacies, as far as the goods, chattels, and credits will extend, in one: sentence, and superadds, “and the law charge you,” as applicable to both debts; and legacies; which were to be paid as far as the goods, chattels, and credits will extend. When the substance of this oath was put into the form of a bond, the subjects of debts and legacies were separated and provided for in distinct sentences;. and the expression which qualified' *the engagement as to both, jointly in the oath, was applied to each separately in the bond; and had the. same meaning both in the oath and bond. If the words “and the law shall charge you” in the oath, had not been considered as a qualification of the preceding stipulation, but as an independant stipulation, and binding the executor to the full extent, to which he might be bound, acting under the will in any way, as' for the proceeds of land sold by him, then it bound him as to creditors as well as legatees; and no imaginable reason can be suggested,- why the same stipulation was not carried into the bond as to debts, so as to bind him to’ pay the debts, in general terms, as the law shouldÉ charge him. But, it is not. He only binds himself to administer the goods,chattels, and credits, according to law. If the expression “and the law shall charge him” in the bond, be considered as an independent stipulation, and not as a qualification of the preceding stipulation as to the payment of the legacies, to the extent of the goods and chattels; then the Legislature will have provided a security for legatees, which they have not provided for creditors; contrary to- the spirit of our laws, and the terms of the executor’s oath, which put them on the same footing. The-Legislature have construed the terms in the executor’s oath, to pay debts as far as the goods, chattels, and credits will extend, and the law charge him, to mean, to pay debts as far as the goods, chattels, and credits will extend, according to law; and so must we construe the same terms in the bond, in relation to the payment of legacies, to mean, that they should be paid as far as the goods, chattels, and credits shall extend, according to law, unless there-be some evidence, arising from the Legislature on this subject, going to shew that the Legislature intended otherwise; without stopping to enquire, whether such an intent could be enforced, if not fairly to be' *405 deduced from the condition oí the bond. The laws have been examined to ascertain what they indicate as to this supposed intention of the legislature. The laws upon this subject have *been repeatedly re-enacted, with some alterations, but the oath and bond have remained in substance the same, with only slight verbal variations, not at all affecting this question.
The act oí 1711 provides, that the bond may be put in suit until the will “be fulfilled;” but, adds “as far as lies in the executors to fulfill the same.” This expression is dropped in the subsequent laws, :aud they direct that it may be put in suit by the party injured by the breach thereof. This expression in the act oí 1711, is un-■dersiood to relate to the fulfillment of so much of the will, as it belongs to the executors, in their character of executors merely, to fulfil; and, not to any super-.added duty, imposed upon them by the will as trustees or otherwise. If it were not confined to their mere character as executors, but was extended to all the duties which might devolve, by the will, on the same person who was executor; then, if a testator said, “T appoint my executors guardians of my children,” or, “my executors shall hold my lands as trustees, for the separate use of my daughter, a married woman, and are to pay the rents and profits to her,” the sureties would be liable for the acts of the executors in their characters of guardians and trustees. The consequences to be deduced from the comparison of the oath and bond, have already been noticed. All the acts require the Courts to take bonds, at least to the value of the “estate.” They require inventories and appraisements of the “estate” to be returned; and, the context shews, that by “estate” was meant “goods, chattels and credits;” for, óf these and these only, the "bond stipulates that an inventory should be returned. “Estate” in the act, and “goods, chattels and credits” in the oath and bond, mean the same thing. If the proceeds of laud, devised to be sold by the executors, had been intended to be secured by the bond, that also should have been taken into the estimate, in fixing the amount of the bond. Again, these statutes provide, that if the testator directs that his executor shall give no security, *and leaves “visible estate sufficient to pay his debts,” the Court shall not require security; but, if the executor 'is suspected of fraud, or the “personal estate” be insufficient for the payment of debts, security shall be required, notwithstanding the direction of the testator to the contrary. The context shews, that “visible estate,” meant “personal estate,” they being used as synonimous. If the executor was believed to be honest, and the personal estate was sufficient for debts, the Court had no discretion, and could not demand security. What was the meaning of this provision? That the executor being honest, and the estate sufficient, there was no danger of any creditor losing his debt, no matter in what order the debts were paid; but, the most honest executor, if the estate were insufficient for the payment of all the debts, might ignorantly commit a devastavit, by paying off debts of inferior dignity, and leaving nothing for the payment of debts of superior dignity; and, if the executor was poor, a creditor who was entitled to be paid out of the assets, might lose his debt. The law intended to secure the creditors against this hazard, and looked only to the security of the personal assets.
The tenor of the statutes, then, indicates, not that the bond was intended to secure the proceeds of real estate devised to be sold, but the contrary.
What effect has our statutory provisions upon the subject of the sale of land devised to be sold, upon this question? It has been already seen, that the proceeds of such land were not, at the Common Raw, in any case a testamentary subject, falling within the jurisdiction of the Ecclesiastical Courts; that an executor was not bound to put them into the inventory, nor to account for them to the Ordinary; and, that the Ecclesiastical Court had no jurisdiction to enforce the payment of a legacy, payable out of such proceeds. At the common law, in whatever order the executor might be bound at law or in equity, to apply the proceeds of land to the payment of debts, he acted in relation to that subject only as trustee. It was a trust superadded *lo the office of executor, and not inseparable from it. Eor, even if they refused the administration and to be executors, they might still execute the will, in relation to the lands; and, if there were more than one executor, and one refused, and the other proved the will, they must both join in executing the trust. 14 Vin. Abr. Devise, P. C. pi. 4, 7, 9, and cases there cited. The statute of 31 Hen. 8, ch. 4, § 1, provided, that “when part of the executors of any persons making a will of lands to be sold by his executors, refuse to take upon them the administration,” a sale and conveyance by such of the executors as accept the administration, shall be valid. This provision was made to obviate the inconvenience of one of the executors, refusing to act, and thus rendering it necessary, that the parties interested, should go into a Court of Equity for relief; but, did not change the character of the fund and render it testamentary. Indeed, in the same statute ch. 5, § 5, it was provided, that “if a man devise lands to be sold, neither the money thereof coming, nor the profits for any time to be taken, shall be accounted as any of the goods and chattels of such person deceased.” This clause is a proviso in a statute regulating the fees of Ordinaries in granting probats and administrations, according to the value of goods and chattels, and may have been intended only to exclude the proceeds of land from being taken into the estimate of the estate, in regulating the fees. Wentw. Off. of Exec. 73. The statute of 31 lien. 8, ch. 4, § 1, was in force in Virginia until the year 1785, when it was enacted here, that “the sale and conveyance of lands devised to be sold, shall be made by the executors or *406 such of them as shall undertake the execution of the will, if no other person be thereby appointed for that purpose; or, if the person so appointed, shall refuse to perform the trust, or shall die before he has completed it.” This was re-enacted in 1792, with this additional provision; “but, if none of the executors named in such will shall qualify, or after they have qualified, *shall die before the sale and conveyance of such lands, then in those cases, the sale and conveyance thereof shall be made by such person or persons, to whom administration of the testator’s estate shall be granted.” Both of those acts, confirmed the sales theretofore made by Sheriffs under orders of Court, of lands devised to be sold. The. act of 1785, in relation to lands devised to be sold, was a' substitute for that of Hen. 8, and founded on the same policy to remove impediments to the execution of the trust, in relation to the sale of lands; but, went a step further, in providing that if another were appointed to execute the trust, and not refusing, died before it was completed, the qualified executor should perform the trust; and, the act of 1792, extended this policy still further, by au-thorising the administrator with the will annexed, to sell and convey. The sole object of these statutes seems to have been, to supply the want of a trustee, by a statutory appointment,, instead of leaving the cestui que trusts to proceed in such cases in a Court of Equity for relief. They obviously indicated no intention, that the proceeds of land should be embraced in the executor’s bond. For, if another were appointed by the will to sell the land, and had undertaken the trust, the executor could not be required to give security, both for the personal estate and the land; the latter of which, might be ten times the value of the former; and, yet the execution of the trust might devolve on the executor by the death, of the trustee. Nor, did these statutes, in any degree, change the quality of the fund proceeding from the sale of lands, in the hands of the executor, in respect to its character as legal or equitable assets. Before the ■ statute of fraudulent devises, 3 W. & M., which was adopted in Virginia in 1726, 4 Hen. Stat. Large p: 164, and re-enacted in 1785, the Courts of Law in England had decided, that in some cases, money in the hands of executors, arising from the sale of land, was assets, which creditors might pursue in a Court of Law, and to be there administered, so far as ^’creditors were concerned. But, that statute, whilst it avoids devises which prejudice creditors, and gives a legal.remedy against the devisee, excepts all devises in any form for the payment of debts, and declares that those for whose benefit the devise was made, and their trustees, shall hold according to the devise. This seems to have converted the proceeds of land devised to be sold for the payment of debts, into an equitable fund which could be pursued only in a Court of Equity. 1 Fonb. Eq. 282, n. 1; and, in Nimmo v. The Commonwealth, this Court in effect decided, that in no case could a creditor claim against an executor the proceeds of land in a Court of Law. Whether there may or may not be cases, in which a Court of Equity would distribute such a fund in the payment of debts, according to their legal priorities, we give no opinion. A debtor might, however, if he pleased, create a trust fund for the payment of his debts, according to their legal priorities, which a Court of Equity would enforce.
But, it is said, that it is, and always has been, the general understanding of the country, that the sureties of an executor are bound for the proceeds of real estate, and that communis error facit jus. We know not how this fact may be; but, we doubt whether such an error could bind the sureties beyond the terms of their obligation. For Í50 years, the practice had been to render judgment against the deputy Sheriff failing to return bail, on a writ requiring bail, under the statute au-thorising such judgment against the Sheriff failing to return bail; and this was at least equitable. For, if judgment were entered against the Sheriff for the default of his deputy, the latter was liable over to the Sheriff. Yet this Court said, that the practice was unlawful, and corrected it.
Upon this point, we are of opinion, that the proceeds of land devised to be sold', are not, and never were, a testamentary subject: that executors hold such proceeds-not in their character of executors, but as trustees: that the literal terms of the exec- . utor’s oath and bond, binds him only *in relation to the goods, chattels and credits of his testator: that there is nothing in our legislation on this subject, which indicates an intention that the obligation should have a greater extent, but the contrary; and that the sureties of an executor are not reponsible for the proceeds of lands sold by him.
The next question is, whether the sureties of the ’executor are responsible for waste committed by the executors of the executor, in the administration of the assets of the first testator; or whether the executor, by directing that his executors shall not give security, thereby makes his sureties so responsible.
The direction that the executors of the executor shall not give security, can be nc prejudice to the creditors or legatees of the first testator; because, if they gave security, it would only be for the administration of the assets of their immediate testator; and the bond would hot avail the creditors and legatees of the first testator, to any purpose.
The executor of an executor is the imme-date executor of the first testator, claiming his legal right as executor, not by virtue of the will of the executor, but of the will of the first testator. 11 Vin. Abr. 421, pi. 6. Every will appointing an executor, gives him an implied authority to continue the executorship, by appointing another; and when appointed, the executor of the executor claims immediately under the first testator, and derives no interest in the goods of the first testator, under the will of the first executor. It is therefore, that if *407 the first executor undertakes to dispose of the goods oí the first testator by his will, the executor of the executor may take them as executor of the first testator, and administer them as such, even if he had assented to the legacy, and might at the com-com law, renounce the execution of the will of the first testator, and accept that of the second testator. 11 Via. 433, pi. 14, notes; Burns’ Keel. Law, 4th vol. p. 190. And it is for this reason, that a feme covert executrix may appoint an executor, who will be the executor of her testator, even without *the consent of her husband. But, such executor cannot be executor of her goods. As to these she is dead intestate, the will being void, and the husband is entitled to administration of her goods. A feme covert cannot bind herself by any act; and all her acts to the prejudice of her husband, are void. Therefore, her will as to her own goods, being to the prejudice of her husband, is void; but her will, so far as it appoints an executor of her testator, is valid; because it is no injury to her husband. If her estate were liable for the devastavit of her testator’s estate, by the executor appointed by her, then her husband might be prejudiced, and responsible out of her assets, for such waste. Bac. Abr. Legacies and Devises, A. Wentw. Off. of Exec. 199. Toll. Law of Exec. 343. The exercise of this power of appointment cannot be a devastavit, even if the executor of the executor should waste the estate of the first testator. But if this were otherwise, and the estate of the executor would be responsible in such case, his sureties would not. Their obligations are limited by the bond, and that stipulates, that the executor will administer according to law, the assets which come to his hands. The assets, which come to the hands of the second executor and were never in the hands of the first, are not embraced by the terms of the bond; for they come to the hands of the second" executor, by virtue of his office of executor of the first testator, and not as executor of the first executor.
The sureties insist, that they are discharged from responsibility, by the admission of the executors of John McRae, jr., that they had received, of the assets of John McRae, sen. which had come to the hands of John McRae, jr., sufficient to' pay the legacies. They are, it is true, discharged from liability to account for the assets, which so came through the hands of John McRae, jr. to those of his executors; but not for such as were received by John McRae, jr., and wasted or converted to his own use. The bond binds them for the legal administration of the assets which came to the hands of their principal, and any portion of *tliem which went into the hands of his executors in kind, was legally administered. As soon as they received them, they held them as executors of John McRae, sen., and were accountable for them as such; and not as executors of John McRae, jr. If John McRae, jr. had died intestate, and his administrator had delivered the assets of John McRae, sen. in kind to the administrator de bonis non of John McRae, sen., that would have been a lawful administration of so much, and would, to that extent, have discharged the sureties of John McRae, jr. The creditors and legatees are entitled to look to the whole estate for satisfaction; and the responsibility of the executors of John McRae, jr. for the assets in their hands, cannot deprive them of their resort to the bond of John McRae, jr., so far as the same has been broken by wasting or appropriating to his own use, a part of the assets of his testator, and which c.ould not come to the hands of the second executors.
Let us apply these principles to the case at bar, and see whether enough appears in these records to charge the sureties with the legacies claimed by the appellees. It appears by the affidavit oí the sureties, and the statement and accounts referred to by the affidavit, that John McRae, jr. received, by collections, of the personal assets of his testator, $83,800 89
And the proceeds of real property, 13,800 36
$96,601 25
And paid debts to the amount of $43,177 98
And legacies to the amount of 35,648 04
-68,836 02
Leaving a balance in his hands of $37,775 23
This balance, being money which could not go as the assets of his testator to his executors, he must be considered as having wasted or converted to his own use, subject, however, to a deduction of the commissions and expenses of administration, which do not appear to have been deducted; *and the whole of this balance should be considered as personal assets, for which his sureties are responsible. Eor, the will of his testator gave him no authority to sell lands for any other purpose than the payment of legacies, Powell v. Robins, 7 Ves. 209; and, having sold lands to the amount of $13,800 36, which he received, and having paid legacies to a larger amount, he must be presumed to have applied the proceeds of the land to their proper object, the payment of legacies, until the contrary appears. If any of those proceeds have been otherwise applied than in the payment of legacies, the sureties would not be responsible for such misappropriation; and in that case, a larger part of the personal assets would appear to have been applied to the payment of debts. This balance of $37,775 23, with interest, subject to the deductions aforesaid, is, as far as distinctly appears from these records, the whole extent of the liability of the sureties. And, as there were, when these bills were filed, legacies besides those claimed by the appellees still due, to an amount exceeding $40,000; and, as the subsistence of two infant legatees, and the annuity to Mrs. Claiborne of £50 per an-num, during life, were to be provided for, over and above the legacies claimed by these parties, and the forty thousand dollars; it is obvious, that the fund for which *408 the sureties were responsible, was not sufficient to pay all; and all the legatees had a right to have this'fund rateably distributed amongst them, since it might be the only available fund for the payment of their legacies. And, therefore, the other legatees should be made parties, unless it hereafter appears to be unnecessary, by ascertaining that the available funds of the estate are sufficient to pay all. But, it appears, that the subsistence of the infant legatees, and one of the legacies of $30,000, has been paid out of the trust-fund, pledged for the indemnity of the sureties. If it appeared that these payments had been made, out of the funds properly belonging to John McRae, jr., and which he might lawfully pledge for the indemnity of his *sureties, they would be entitled to a credit, to that extent, against their liability on account of the waste of the personal assets, by John McRae, jr. ' But, on the contrary, if these payments were made out of property belonging to the estate of John McR.ae, sen., pledged by John McRae, jr., or his executors, to indemnify his sureties, they could have no such credit, whether the property so applied was real or personal. For, John McRae, jr. and his executors, could not properly pledge any property of his testator, to indemnify his sureties against his waste of other property, or for his own debts; and thus withdraw it from the claims of the legatees. As to any personal property, so pledged by John McRae, jr., the legatees might elect to consider it as a devastavit by John Mc-Rae, jr., since his deed prevented the legal title from passing to his executors, and the property from being administered by them as the property of John McRae, sen., and might charge his sureties for the value thereof; in which case, the latter would, be entitled to a credit for so much of the proceeds of such personal property, as was duly applied to the payment of the debts or legacies of John McRae, sen.; or the legatees might elect, in equity, to claim the property and its profits and proceeds, to be applied to the payment of their legacies; the conveyance being a breach of trust by the executor, in which the sureties participated.
The records in these cases do no't enable us to ascertain how much of the trust-fund was the property of John McRae, the elder, and how much, of John McRae, the younger. The bill of the sureties, in one of the cases, alledges, that a part of the trust-fund belonged to John McRae, the elder. Some of the land was of that description; and the slaves and turnpike stock, conveyed for the benefit of the sureties, and the bank stock conveyed for the indemnity of the sureties of John McRae, jr., for his debt to the residuary legatees, may have been of that description. We cannot, however, ascertain that they were. We think that the balance due upon the legacies claimed *by the appellees, was sufficiently ascertained to charge the appellants. By the will, each of them was entitled to £1,000, and credits have been given according to accounts furnished by the executors of John McRae, jr.; and the appellants did not alledge that any other payments had been made. It is unnecessary to enquire, whether the accounts taken in the other causes, in which the appellants were parties, are evidence against them in this; since the case must go back to the Court below, and the necessary accounts be now taken.
The decrees must be reversed, and the cause remanded for proper accounts to be taken, for ascertaining the extent of the liability of the sureties, and for a proper disposition of the sum, for which they may be responsible according to the foregoing views.

 Judge Carr, did not sit in this case, it having been argued before his appointment.